832 A.2d 207

## ATLANTIC GOLF, LIMITED PARTNERSHIP

v.

## MARYLAND ECONOMIC DEVELOPMENT CORPORATION et al.

**No. 64, Sept. Term, 2001.**

Court of Appeals of Maryland.

Sept. 11, 2003.

Jeff Evan Lowinger, Vincent C. Burke, III (Furey, Doolan & Abell, LLP, on brief), Chevy Chase, for petitioner.

George A. Nilson (Natalie F. Zaidman, Piper, Marbury, Rudnick & Wolfe, LLP, George W. Liebmann, Liebmann & Shively, P.A., on brief), Baltimore, Robert A. Zarnoch, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Annapolis, for respondents.

Gary R. Alexander, Jason A. Deloach, Fort Washington, Brief of Amicus Curiae/Appellees, Greenspring Investments Ltd. Partnership & Koch & Associates, Inc.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

## PER CURIAM ORDER

For reasons to be stated in an opinion later to be filed, it is this 7th day of November, 2001,

ORDERED, by the Court of Appeals of Maryland, that the judgment of the Circuit Court for Montgomery County be,

and it is hereby, AFFIRMED. Costs to be paid by the Appellant. Mandate to issue forthwith.

ELDRIDGE, J.

On November 7, 2001, we issued an order affirming the judgment of the Circuit Court for Montgomery County in this case. We shall now set forth the reasons for that order.

The issue in this case is whether the provision in Article III, § 48, of the Maryland Constitution, which revokes the tax-exempt status of previously tax-exempt corporations that have availed themselves "of any rights, privileges or advantages" granted by the Legislature, is applicable to a public corporation. We hold that this constitutional provision is not applicable to a public corporation.[1]

## I.

In 1984, the Maryland General Assembly created the Maryland Economic Development Corporation ("MEDCO"), Maryland Code (1957, 1982 Repl.Vol., 1985 Supp.), Article 41, §§ 558 through 573, as a public corporation with the objective of promoting economic development within the state.[2] The

---

1. This Court has defined and elaborated upon the concept of a public corporation in prior cases. *Pearson v. Murray*, 169 Md. 478, 481, 182 A. 590, 591 (1936) (" 'When the corporation is said, at the bar, to be public, it is not merely meant, that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control and direct the corporation, and its funds and its franchises, at its own good will and pleasure' "); *Phillips v. Mayor, etc., of Baltimore*, 110 Md. 431, 438, 72 A. 902, 905 (1909) (" 'a public corporation, is one that is created for political purposes, with political powers, to be exercised for purposes connected with the public good, *in the administration of civil government;* an instrument of the government, subject to the control of the Legislature, and its members officers of the government, for the administration or discharge of public duties, as the case of cities, towns'.... 'Public corporations are synonymous with municipal or political corporations.' * * * 'Public corporations, commonly called municipal corporations, are not associations, but subdivisions of the State' ") (emphasis in original).

2. *See* Code (1957, 1982 Repl.Vol., 1985 Supp.), Article 41, § 559 (discussing the intent of the General Assembly in creating MEDCO):
   "The General Assembly declares and finds that Maryland's economy continues to experience technological change and restructuring.

Legislature granted MEDCO various powers to carry out its statutory objective, including the power to "[b]orrow money and issue bonds for the purpose of financing or refinancing" the cost of its economic development projects, Article 41, § 562(12), and an exemption from state taxation "[w]ith the exception of [certain specified] State and local real estate taxes." Article 41, § 567. The Legislature further provided in § 567 that "[t]he bonds of the Corporation and the interest thereon are forever exempt from all State, municipal, and local taxation."

In 1994, Anne Arundel County circulated a request for proposals to finance, construct, and operate a public golf course in the Pasadena area of Anne Arundel County. In 1997, MEDCO responded to this request, along with several

The General Assembly recognizes that, while technological change sometimes results in economic contraction and dislocation, it also affords opportunities to expand productive employment and expand the State's economy and tax base.

"The General Assembly further declares and finds that the establishment of a State public corporation to develop certain vacant or underutilized industrial sites and facilities as well as other economic resources in which the private sector has not demonstrated serious and significant interest or development capability would serve the public interest. It would complement existing State marketing programs administered by the Department of Economic and Community Development through its Division of Economic Development and through financial assistance programs such as those of the Maryland Industrial Development Financing Authority and those under the Maryland Industrial Land Act and the Maryland Industrial and Commercial Redevelopment Fund Act. The General Assembly finds that the State lacks and needs direct property development capability for economic development purposes.

"The General Assembly intends that the Maryland Economic Development Corporation operate in areas of the State experiencing significant economic dislocation or distress and that it exercise its corporate powers to assist State and local economic development agencies contribute in the expansion, modernization, and retention of existing Maryland enterprises as well as the attraction of new business to the State, In furtherance of the purposes of this subtitle, it is also intended that the Corporation structure its projects in a manner which accelerates the transfer of facilities and sites into productive use in the private sector and cooperate with private industry councils, representatives of labor, and local governments in maximizing new economic opportunities for the citizens of this State."

private golf course developers. Anne Arundel County select-
ed MEDCO to develop the project,[3] and accordingly the
County entered into a "Golf Course System Agreement" with
MEDCO on December 1, 1997, whereby MEDCO would issue
$17 million in tax-exempt revenue bonds, would use the pro-
ceeds therefrom to construct a golf course, would operate the
course for the County, and would eventually turn the project
over the County when the bonds were paid off.

In October 2000, on the eve of the issuance of the bonds,
MEDCO received notification from Atlantic Golf, a limited
partnership and private entity that owned a competing golf
course in Anne Arundel County, that Atlantic Golf was chal-
lenging MEDCO's issuance of the bonds as an *ultra vires* act
that was beyond the scope of MEDCO's enabling act. Atlan-
tic Golf claimed that the Pasadena golf course project exceed-
ed MEDCO's then-existing statutory authorization on the
grounds that: (1) the project was not located in an area of the
state that was "experiencing significant economic dislocation
or distress," as required by Maryland Code (1957, 1998 Repl.
Vol.), Article 83A, § 5–202(c); (2) the private sector had
demonstrated significant interest in the bid, and therefore
MEDCO should not have bid on the project, pursuant to § 5–
202(b) (mission of corporation includes developing "economic
resources in which the private sector has not demonstrated
serious and significant interest or development capability
[that] would serve the public interest"); and (3) the project
was structured under the Golf Course System Agreement to
remain permanently as public property, rather than to be
turned over to the private sector following its completion as
required under § 5–202(c). In response to Atlantic Golf's
claim that MEDCO had violated statutory provisions, MEDCO
cancelled the issuance of the tax-exempt bonds for the golf
course project and requested from the General Assembly
relief from the restrictions imposed by law, as well as expand-
ed powers that would permit it to complete the project.

---

**3.** Appellant Atlantic Golf decided not to submit a bid on the Pasadena
golf course project.

The General Assembly responded to MEDCO's request for revisions to its enabling legislation by thoroughly revising the statutes so as to permit MEDCO to conduct the transactions incident to building and operating the Pasadena golf course. On April 20, 2001, the Governor of Maryland signed these revisions into law as Ch. 338 of the Acts of 2001. This legislation authorized MEDCO to undertake projects anywhere in Maryland and not solely in distressed areas (Article 83A, § 5–202(c)(1)), authorized it to compete with private taxpaying enterprises (§ 5–202(c)(5)(i)(ii)), authorized MEDCO to own for profit enterprises (§ 5–205(16)), removed the requirement that MEDCO turn over its projects to private enterprises upon completion (§ 5–202(c)(2)), and removed the requirement that MEDCO projects be located upon land conveyed to MEDCO by the State (§ 5–201(h)(i)).

MEDCO subsequently announced that its first project under the new legislation would be the Pasadena golf course. In response to this announcement by MEDCO, Atlantic Golf filed a complaint on May 1, 2001, in the Circuit Court for Montgomery County, seeking a declaratory judgment that MEDCO had surrendered its tax-exempt status under Article III, § 48, of the Maryland Constitution, as a result of the amendments to the statutory provisions governing MEDCO.[4] Atlantic Golf

---

4.  Article III, § 48, provides as follows:

"Corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes and except in cases where no general laws exist, providing for the creation of corporations of the same general character, as the corporation proposed to be created; and any act of incorporation passed in violation of this section shall be void. All charters granted, or adopted in pursuance of this section, and all charters heretofore granted and created, subject to repeal or modification, may be altered, from time to time, or be repealed; Provided, nothing herein contained shall be construed to extend to Banks, or the incorporation thereof. The General Assembly shall not alter or amend the Charter, of any Corporation existing at the time of the adoption of this Article, or pass any other general or special law for the benefit of such Corporation, except upon the condition that such Corporation shall surrender all claim to exemption from taxation or from the repeal or modification of its Charter, and that such Corporation shall thereafter hold its Charter subject to the provisions of this Constitution; and any Corpo-

further alleged in its complaint that, because MEDCO had surrendered its tax exemption, all of its activities and revenue, as well as the bonds that it had issued to finance the Pasadena golf course (and any interest thereon), were subject to taxation as of April 20, 2001. Atlantic Golf specifically relied upon the second clause of the third sentence in Article III, § 48, which states:

"... and any Corporation chartered by this State which shall accept, use, enjoy, or in any wise avail itself of any rights, privileges or advantages that may hereafter be granted or conferred by any general or special Act, shall be conclusively presumed to have thereby surrendered any exemption from taxation to which it may be entitled under its Charter, and shall be thereafter subject to taxation as if no such exemption has been granted by its Charter."

The State of Maryland filed a motion to intervene as "an additional party defendant in support of the constitutionality and continuing validity" of the statutory provision granting MEDCO a tax exemption. The Circuit Court granted this motion.

The defendants, MEDCO and the State, each filed motions for summary judgment, in which they argued that Article III, § 48, did not require MEDCO to forfeit its tax-exempt status. The defendants contended that the tax exemption surrender provision was inapplicable to MEDCO because MEDCO was a public corporation. The defendants took the position that the purpose of Article III, § 48, was to affect the status of private corporations, not public ones. They further asserted that the constitutional provision only applied to corporations chartered

---

ration chartered by this State which shall accept, use, enjoy, or in any wise avail itself of any rights, privileges or advantages that may hereafter be granted or conferred by any general or special Act, shall be conclusively presumed to have thereby surrendered any exemption from taxation to which it may be entitled under its Charter, and shall be thereafter subject to taxation as if no such exemption has been granted by its Charter."
The clause relating to the surrender of a tax exemption was proposed by Ch. 195 of the Acts of 1890, and ratified by the voters on November 3, 1891.

prior to 1851, whereas MEDCO was created in 1984. The defendants also claimed that the constitutional provision covered only corporate entities that operated under a "charter," and that, as a public corporation, MEDCO was founded and governed by an act of the Legislature, not a charter.

The Circuit Court granted both of the defendants' motions for summary judgment, and entered a declaratory judgment that Article III, § 48, did not apply to either public corporations or to corporations that were formed after 1851. Atlantic Golf took an appeal and, prior to any proceedings in the Court of Special Appeals, filed in this Court a petition for a writ of certiorari presenting the question of whether "the tax exemption surrender provision ... [is] limited to private corporations chartered prior to 1851, or limited to private chartered corporations, and therefore, inapplicable to a public corporation like MEDCO?" We granted the petition, *Atlantic Golf v. MEDCO,* 365 Md. 472, 781 A.2d 778 (2001).

## II.

Atlantic Golf argues before this Court that MEDCO is covered by the third sentence of Article III, § 48, because the tax exemption surrender provision applies to both public entities and to corporations chartered after 1851. Atlantic Golf explains that, for instance, the provision affects all corporations that operate under a "charter," and that MEDCO qualifies as operating under a "charter" in that it functions pursuant to enabling legislation. According to Atlantic Golf, MEDCO's enabling act is equivalent to a "charter" under Maryland law. *See* Code (1975, 1999 Repl.Vol.), § 1–101(e)(1)(i) of the Corporations and Associations Article (" 'Charter' includes ... [a] charter granted by special act of the General Assembly").

MEDCO and the State respond that public corporations are not covered under the tax exemption surrender provision. First, they argue that a public corporation such as MEDCO does not fall within the provision based on the language of the provision. The appellees explain that the provision involves

"any exemption from taxation to which [a corporation] may be *entitled,*" that public corporations are not covered under this language because their "enabling act[s] ... can always be repealed or modified," and that, therefore, they have no *entitlements* to tax exemptions or to any other right, privilege, or power (State's brief at 6–7, emphasis added). MEDCO and the State also claim that MEDCO is not covered as a public corporation because it does not operate under a "charter." According to the appellees, a "charter" refers specifically to a contract between the State and a private corporate entity, a contract that the State often cannot change because of the prohibition in Article I, cl. 10, of the federal constitution against the impairment of contracts. MEDCO and the State explain that, in contrast to a charter, MEDCO's enabling act is subject to alteration at will by the Legislature. They rely on *Mayor & City Council of Hagerstown v. Sehner,* 37 Md. 180, 193 (1872) (stating that public corporations are " 'mere organizations for public purposes, liable to have their public powers, rights and duties modified or abolished at any moment by the Legislature. * * * [G]enerally, the doings between them and the Legislature are in the nature of legislation rather than compact, and therefore to be considered as not violated by subsequent legislative changes' ").

MEDCO and the State further argue that, based on the history of the constitutional provision, the framers intended that it affect solely private corporations. They state that the provision was intended to apply specifically to private railroad companies that were chartered prior to 1851. The appellees refer to an 1890 message to the General Assembly by then Governor Elihu Jackson, who was instrumental in proposing the constitutional amendment that included the tax exemption surrender provision, in which Governor Jackson stated that the purpose of the amendment was to limit the tax exemptions of the railroad companies.

### III.

We hold that the tax exemption surrender provision is inapplicable to public corporations such as MEDCO and that,

therefore, MEDCO is not required to relinquish its tax exemption as a result of the alterations to its enabling legislation. We need not and do not reach the issue of whether the provision applies only to corporations chartered prior to 1851.

■ Preliminarily, we do not agree with MEDCO's and the State's argument that the word "charter" acts to exclude public corporations. The enabling act of a public corporation fits within the Maryland statutory definition of a "charter." *See* § 1–101(e)(1)(i) of the Corporations and Associations Article; *Trailway Oil Co. v. City of Mobile,* 271 Ala. 218, 225, 122 So.2d 757, 764 (1960); *Matthews v. Macon Water Auth.,* 273 Ga. 436, 437, 542 S.E.2d 106, 107 (2001); *McDonald v. Brooks,* 215 Tenn. 535, 540, 387 S.W.2d 803, 805 (1965). In addition, this Court has consistently recognized that municipal corporations, home rule counties, and certain other government entities operate under charters. *See, e.g., Mayor & Council of Rockville v. Woodmont Country Club,* 348 Md. 572, 575, 705 A.2d 301, 302 (1998). Moreover, the enabling act of MEDCO is similar in form and function to the charter of a private corporation, in that MEDCO's enabling act lists an array of powers and operational guidelines. The fact that the enabling act is "ordinary legislation" which the legislature may amend freely does not distinguish it from private charter. The terms of a private charter may also be altered or repealed under the second sentence of Article III, § 48, of the Maryland Constitution, as long as there is no violation of other constitutional prohibitions. *See State v. Good Samaritan Hospital, Inc.,* 299 Md. 310, 321–322, 473 A.2d 892, 898, *appeal dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984) (" § 48 of Article III of the Constitution of Maryland explicitly provides that corporate charters are 'subject to repeal or modification [and] may be altered, from time to time, or be repealed.' * * * These constitutional and statutory provisions are plain manifestations of the well-settled principle that a corporation holds its charter subject to the constitutional exercise of the State's … power to legislate in the public interest. *See, e.g., Insurance Comm'r v. Blue Shield,* 295 Md. 496, 456 A.2d 914 (1983); *Blum v. Engelman,* 190 Md. 109, 57 A.2d 421 (1948)").

Nevertheless, the language of § 48 as a whole indicates that the tax exemption surrender clause does not apply to public corporations. The first and second sentences of § 48, adopted in 1851, suggest that § 48 is limited in its application to private corporations. The first sentence states that corporations "may be formed under general laws" and need not be created by an act of the Legislature, and briefly refers to municipal corporations as the exception to this rule. The second sentence, which provides that the State has the power to repeal or modify charters, is obviously limited in its application to private corporations. There is no need for such a provision with regard to public corporations. The authority granted by the second sentence is identical to the authority that the Legislature already held in 1851 to amend at will the enabling legislation of public corporations. *See Regents of University of Maryland v. Williams*, 9 G. & J., 365, 397 (1838) ("A public corporation, is one that is created for political purposes, with political powers, to be exercised for purposes connected with the public good in the administration of civil government; an instrument of the government subject to the control of the Legislature, and its members officers of the government, for the administration or discharge of public duties . . ."). *See also State v. Board of Education*, 346 Md. 633, 645, 697 A.2d 1334, 1340 (1997) (" '[P]ublic corporations . . . are instruments of government subject at all times to the control of the Legislature with respect to their duration, powers, rights and property,' " quoting *City of Hagerstown v. Sehner, supra*, 37 Md. at 193); *Board v. Secretary of Personnel*, 317 Md. 34, 44–45, 562 A.2d 700, 705 (1989); *State v. B. & O.R.R. Co.*, 12 G. & J. 399 (1842), *affirmed*, 3 How. 534, 11 L.Ed. 714 (1845). To interpret the second sentence of § 48 to apply to public corporations would therefore render that sentence mere surplusage, and we do not construe enactments so as to render "any portion . . . superfluous or nugatory," *Facon v. State*, 375 Md. 435, 446, 825 A.2d 1096, 1102 (2003), and cases there cited.

The historical background surrounding the enactment of the tax exemption surrender provision also supports a construction that would exclude public corporations. As previously

mentioned, the origin of the provision was an 1890 message of Governor Elihu Jackson to the General Assembly. *See* 1890 House and Senate Documents at 7–10. The provision's target were the tax exemptions that had been given to private railroad companies during an earlier period of time. As Governor Jackson explained in his 1890 address, the State prior to 1851 had granted charters to private railroad companies and had included in these charters tax exemptions so as to promote the financial growth of these fledgling companies. By 1890, however, the railroad companies had long since become extremely profitable enterprises, and the State Treasury was losing a great deal of revenue each year as a result of the previously granted exemptions. In response to this situation, Governor Jackson proposed a constitutional amendment, the tax exemption surrender provision, to the then existing version of § 48, so that the State would have access to the "wealth ... these corporations should pay to bring them upon an equality with the rest of the people." *Id.* at 7.

In his Message to the General Assembly in 1892, following the ratification of the constitutional amendment, Governor Jackson commented: "The State is under no obligation to grant to the Baltimore and Ohio Railroad Company or to the Northern Central Railway Company, any new privileges or concession and may justly and reasonably withhold them, so long as they refuse to submit to the equal and uniform rule of taxation applied to all other corporations and to every individual enjoying the protection of its laws." Governor Jackson's Message to the General Assembly of January 6, 1892, 1892 House and Senate Documents at 19.

■ Further support for MEDCO's and the State's interpretation of § 48 is the principle that enactments are not construed as applying to the enacting authority unless they expressly so provide. *See Baltimore v. State,* 281 Md. 217, 223–224, 378 A.2d 1326, 1329–1330 (1977):

"In this regard, it is a basic and long-standing principle of statutory construction that the State is not deemed to be bound by an enactment of the General Assembly unless the enactment specifically names the State or manifests a clear

and indisputable intention that the State is to be bound. In *State v. Milburn,* 9 Gill 105, 118 (1850), this Court, quoting Mr. Justice Story, stated:

> ' "General Acts of the Legislature are meant to regulate and direct the acts and rights of citizens, and in most cases, the reasoning applicable to them applies with very different, and often contrary force, to the government itself. It appears to me, therefore, to be a safe rule, founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the Act." '

*Accord, Harden v. Mass Transit Administration,* 277 Md. 399, 354 A.2d 817 (1976); *Public Indemnity Co. v. Page,* 161 Md. 239, 156 A. 791 (1931); *County Comm'rs of Balto. Co. v. Board, Etc., of Md. Hospital, Etc.,* 62 Md. 127 (1884); *State v. Balt. & Ohio R.R. Co.,* 34 Md. 344 (1871)."

*See also Glascock v. Baltimore County,* 321 Md. 118, 121, 581 A.2d 822, 823–824 (1990); *Nationwide Mut. Ins. Co. v. United States Fidelity & Guaranty Co.,* 314 Md. 131, 137, 550 A.2d 69, 72 (1988).

For the foregoing reasons, we hold that the tax exemption surrender provision is inapplicable to MEDCO.